**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**
**CENTRAL DIVISION**

| | |
|---|---|
| JAMES WEBSTER et al., | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | Case No. 2:07-CV-888-DN |
| MARK GOWER et al., | Magistrate Judge David Nuffer |
| Defendants. | |

Plaintiffs James Webster and Lisa Long are the natural parents of Bradley James Long, who was an adult prisoner at the Iron County Jail when he took his own life on November 16, 2006. Plaintiffs brought the present suit against Iron County and various Iron County officials alleging violations of Long's civil rights under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2009). Before the Court are Plaintiffs' and Defendants' respective motions for summary judgment.

## ANALYSIS

### I. Factual Background

The material facts presented here are drawn from the affidavits, depositions and jail records on file. These facts are largely undisputed, except as noted herein.

Early in the morning on November 16, 2006, James Bradley Long was arrested by officers with the Cedar City Police

Department.  At the time of his arrest, Long was under the influence of drugs.  Plaintiff was subsequently taken to the Iron County Jail where he was initially processed by Officer Barth, the Officer in Charge, at about 5:00 a.m..  During processing Barth asked Long whether he had ever thought of committing suicide, to which Long answered "yes."  Barth then asked Long if he was presently considering suicide, Long initially mumbled an unintelligible response but after further questioning stated "no."  Barth reported that during this exchange Long was smiling but that Long had a "slow, sarcastic attitude" during the entire booking process.  During booking Plaintiff was uncooperative and made threatening remarks towards Barth and another officer, threatening to punch them.  After initial processing Long was placed in the "bail booth."

At about 5:30 a.m. Defendant Cheney arrived at the jail to begin work as the day shift supervisor.  During the shift change Barth told Cheney about the problems with Long being uncooperative and making threats.  Cheney noted that the initial assessment for Long had been completed and that the booking computer screens were completed.  At about 5:40 a.m. Cheney moved Long from the bail booth to a pre-admission cell near the booking area so Long could be observed more closely.  Pre-admission cells are commonly used for suicide watch or for observing inmates who

are intoxicated.  Plaintiff was not placed on suicide watch but was placed in a pre-admission cell to sleep off his intoxication. Long remained in the pre-admission cell until 6:38 a.m., when he was removed to complete the booking process by having his fingerprints and photograph taken.  Long was initially resistant but ultimately complied with the booking procedures.  Long was then returned to the pre-admission cell.

Shortly before noon, Cheney was informed that Long had requested to be moved to general population before the noon inmate count.  At about 12:21 p.m., Long was moved to C-Block cell C107 in the general population area for county inmates.  At the time of Long's arrival the cell was also occupied by another inmate, Eric Rodriguez.

Defendant Fischer was the County Control Officer on duty when Plaintiff arrived in the general population housing unit. Fischer had just begun his shift at noon.  As County Control Officer, Fischer was responsible for observing county inmates in cell blocks A-C, opening and closing doors in the county section, maintaining a log of people entering and exiting each section, and communicating with inmates and other officers.  The County Control Officer is not permitted to leave the control room without first being relieved by another officer.  Shortly after coming on duty, Fischer noticed that Long was in the day room or

common area talking to other inmates when he was not supposed to be outside his cell.  At 2:33 p.m. Fischer instructed Plaintiff to go back into his cell with Rodriguez.  At 2:39 p.m. Fischer opened the cell door to allow Rodriguez, who was being released from jail, to exit.  Fischer saw Long attempt to sneak out of the cell with Rodriguez and instructed Long to return to the cell. Fischer had to tell Long three times to return to the cell before Long complied.

As Rodriguez was leaving the County section to be released, he reported to Fischer that Long was "acting weird" and was "tying a sheet to his window."  Fischer called on the radio for a "rover," an officer who walks around the section to more closely manage and supervise inmates, to come check on Long in his cell. Fischer also asked over the intercom for the "tier worker," inmate Shawn Bates, to check on Long.  A tier worker is an inmate who performs tasks within the section such as gathering laundry and cleaning the common area or day room.  Fischer told Bates, and also repeated over the radio, exactly what Rodriguez had reported, that "Long was acting weird and tying a bed sheet to his window."

In response to Fischer's radio call, Cheney recruited two other officers, Defendants Spencer and Sissener, to go with him

to check on Long.[1]  As the officers approached Long's cell, they observed Long working out doing physical exercises such as pull-ups using a sheet tied to the window bars.  Cheney asked Long what he was doing and Long stated, "I'm just working out."  Cheney then ordered Long to remove the sheet, which he did, placing it back on his bed.  Cheney asked long if he was feeling alright and Long stated that he was feeling "just fine."  Cheney again inquired if Long was really alright and Long stated, "Cheney, don't worry about me, I've been here a million times, I'm okay, really."  Fischer was able to listen in on this conversation over the cell intercom.  At about 2:48 p.m. Cheney and the other officers exited the housing unit and went to the control room to report back to Fischer.  Cheney recounted his conversation with Long and told Fischer to closely monitor Long using the intercom and to note any unusual behavior.

At approximately 2:49 p.m. Fischer observed Inmate Bates, the tier worker, talking to Long in his cell.  Fischer also observed two other inmates talking to long about a minute later.  Shortly thereafter, Fischer asked Long over the intercom if he wanted to switch to the lower bunk; Long stated that he did, and Fischer entered this information into the computer.  After

---

[1]  It is unclear whether Cheney was the "rover" on duty or whether he responded as the shift supervisor.

visiting with Long, Bates reported back to Fischer that Long was acting a "little weird."  During this conversation Bates told Fischer that another inmate had expressed the opinion that Long might do something "stupid" or "dumb."  Fischer thanked Bates and asked him to keep an eye on Long and report if he noticed anything else.  According to Fischer, he did not have any further conversation with Bates, or any other inmate, regarding Long that day.  Fischer states that following his conversation with Bates he definitely thought Long's "risk factor" had gone up but believed it was a jail security issue rather than a threat to Long's personal safety.  Fischer continued to monitor Long's cell intercom but did not hear anything besides normal conversation or sounds.  Fischer's last personal contact with Long was at 4:00 p.m..

Inmate Bates states that following his initial conversation with Fischer, he went back and spoke with Long again to see how Long was doing.  After checking on Long, Bates talked to another inmate, Russell Jones, who was also friendly with Long.  Bates asked Jones whether he thought Long was likely to hurt himself and Jones replied that he believed Long would.  Bates states that he checked in on Long again at 4:00 p.m. and saw that Long again had sheets tied to his window bars.

Contrary to Fischer's testimony, Bates states that shortly

after 4:00 p.m. he reported back to Fischer that he believed Long would hurt himself.  Although it appears Bates failed to report that Long was again tying sheets to his window bars, Bates states that he told Fischer that Long was indeed acting weird and asked that another inmate be placed in Long's cell to watch him. According to Bates, Fischer refused to assign Long a cell-mate but instead told Bates that he would continue to monitor Long's cell by intercom.[2]

At 4:45 p.m. Fischer left the control room to conduct an inmate count.  Fischer arrived at Long's cell at about 4:49 p.m. and found that the cell window was covered.  Fischer order Long to uncover the window but received no response.  Fischer then called for backup and immediately entered the cell alone where he found Long hanging from his neck by a sheet.  Fischer immediately

---

[2]  Defendants' summary judgment briefs repeatedly object to the affidavits of Bates, Jones and Rodriguez as hearsay, however, Defendants have not filed a proper motion to exclude any evidence on that ground.  Moreover, the Court finds Defendants' hearsay objections to be unfounded.  Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*."  Fed. R. Evid. 810(c) (emphasis added).  None of the statements challenged by Defendants as "hearsay" appear to be offered in evidence to prove the truth of the matter asserted.  For instance, Bates' testimony regarding what he told Fischer, or what Fischer told him, is not offered to prove the truth of either of their statements, instead, it is merely offered as circumstantial evidence of Fischer's state of mind.  *See* Fed. R. Evid. 803(3).

began trying to loosen the sheet around Long's neck and within
seconds other officers arrived to assist.  The officers began CPR
on Long at about 4:54 p.m..  At 5:25 p.m. an ambulance arrived
and transported Long to the Cedar City hospital where he was
later pronounced dead.

## II. Summary Judgement Standard

Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c)(2).  "One of the principal purposes of the
summary judgment rule is to isolate and dispose of factually
unsupported claims or defenses . . . ."  *Cellotex v. Catrett*, 477
U.S. 317, 324, 106 S. Ct. 2548, 2553 (1986).  Thus, Rule 56(a)
allows a party claiming relief to move, "with or without
supporting affidavits, for summary judgment on all or part of [a]
claim."  Fed. R. Civ. P. 56(a)(2).

The party moving for summary judgment bears the initial
burden of showing "that there is an absence of evidence to
support the non-moving party's case."  *Cellotex v. Catrett*, 477
U.S. 317, 325 (1986).  This burden may be met merely by
identifying portions of the record which show an absence of
evidence to support an essential element of the opposing party's

case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Under Rule 56(e)(2) a nonmovant that would bear the burden of persuasion at trial must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and references to the pleadings will not suffice. However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on multiple grounds. First, Defendants contend that Plaintiffs lack standing under

§ 1983 because they have not been designated personal representatives of Long's estate.  Second, Defendants assert that the undisputed facts here do not support an Eighth Amendment claim because Defendants were not deliberately indifferent to a serious risk of harm to Long.  Third, Defendants contend that Plaintiffs cannot show an affirmative link between Long's suicide and the actions of Sheriff Gower, Iron County, Lieutenant Spencer or Deputy Sissener.  Fourth, Defendants contend that Iron County cannot be held liable because Plaintiffs have not identified any county custom or policy which directly caused Long's death. Finally, Defendants assert that even if an Eighth Amendment violation occurred, Defendants are entitled to qualified immunity because the right at issue here was not clearly established at the time of Long's death.

## A. Standing

Plaintiffs bring this suit in their individual capacities as heirs of Bradley James Long.  Plaintiffs assert standing based on Utah's wrongful death statute, which permits a decedent's heirs to maintain an action for damages against the person causing the death.  U.C.A. § 78B-3-106 (West 2009).  However, Plaintiffs request that if they are found to lack standing in their individual capacities that they be permitted to substitute the Estate of Bradley James Long as the real party in interest under

Rule 17(a).  Fed. R. Civ. P. 17 (a).

Defendants contend that Utah's wrongful death statute is
inapplicable here and that Plaintiffs do not have standing under
§ 1983 to pursue claims in their individual capacities for
violations of Long's civil rights.  Defendants further argue that
Plaintiffs should not be allowed to amend their Complaint now
because the deadline for amended pleadings expired on July 1,
2008, and Plaintiffs have been aware of this issue since March
22, 2008.  Defendants also assert that allowing amendment of the
Complaint at this stage would cause them undue prejudice.

 It is well established that "constitutional rights are
personal and may not be asserted vicariously." *Broadrick v.
Oklahoma*, 413 U.S. 601, 610, 93 S. Ct. 2908, 2915 (1973).  Thus,
a plaintiff cannot recover damages under § 1983 for harms they
suffered as a result of another's death.  Instead, the Tenth
Circuit has held that the federal remedy to be applied to § 1983
death cases "should be a survival action, brought by the *estate
of the deceased victim*, in accord with § 1983's express statement
that the liability is 'to the party injured.'"  *Berry v. City of
Muskogee*, 900 F.2d 1489, 1506-07 (10th Cir. 1990) (citing 42
U.S.C. § 1983)(emphasis added).

Because Long is the party whose constitutional rights were
allegedly violated here, Plaintiffs do not have standing under

§ 1983 to pursue a wrongful death action in their individual capacities. Thus, the Court must decide whether this suit should be dismissed or whether Long's estate may be substituted as the real party in interest at this stage.

Rule 17(a)(3) of the Federal Rules of Civil Procedure states:

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Fed. R. Civ. P. 17(a)(3). In accordance with this rule, Plaintiffs must be afforded a reasonable time to substitute the real party in interest before their case is dismissed. The Court is not convinced that allowing substitution at this time would work any undue hardship upon Defendants. Thus, within sixty days of this order Plaintiffs shall amend their Complaint to substitute the Estate of Bradley James Long as the real party in interest in this case.

## B. Eighth Amendment Analysis

### i. Legal Standard

The Tenth Circuit has held that claims arising from a failure to prevent prisoner suicide "are considered and treated

as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997). In *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (quoting Greg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909 (1976)). Although "[p]retrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, [the Tenth Circuit] applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." *Lopez v. LeMaster*, 172 F.3d 756, 759 n. 2 (10th Cir.1999).

"Deliberate indifference involves both an objective and a subjective component." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). The objective component is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994). It is widely recognized that suicide satisfies this requirement. *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) ("[I]t goes without saying that suicide is a serious harm."); *see also Gaston v. Ploeger*, No. 08-3028, 2008 WL 4672294, at *3 (10th Cir. Oct. 23, 2008) ("Obviously, suicide satisfies this requirement.")

13

The subjective component of the deliberate indifference test requires a showing that the defendant acted with a culpable state of mind. The Supreme Court has held that the required *mens rea* lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other . . . ." *Farmer*, 511 U.S. at 836. The Court went on to say that "a prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

A defendant's knowledge of a substantial risk may be proven by circumstantial evidence, including evidence "that the risk was obvious," *id*. at 842, however, the threshold for obviousness is very high. The Supreme Court has cautioned that an obvious risk cannot *conclusively* establish an inference that the official subjectively knew of the substantial risk of harm, because "a prison official may show that the obvious escaped him." *Id*. at 843 n. 8. On the other hand, a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.*

### ii. Deliberate Indifference

Applying the above standard, the Court must decide whether the undisputed facts in this case, viewed in the light most favorable to Plaintiffs, are sufficient to lead a reasonable trier of fact to conclude that each of the defendants were deliberately indifferent to the risk that Plaintiff might attempt suicide.

### a. Sheriff Mark Gower

Plaintiffs have not presented any evidence showing that Defendant Gower, the Iron County Sheriff, was personally aware of any facts which might lead him to believe that Long was at risk of committing suicide.  In fact, Plaintiffs concede that "Defendant Gower had no direct involvement in this case" and that "there is simply not evidence to substantiate a claim otherwise." (Pls.' Mem. Opp'n Defs.' Mot. Summ. J. at 39.)  Thus, Plaintiffs clearly cannot make out a claim of deliberate indifference against Defendant Gower and he is entitled to summary judgment.

### b. Defendants Sissener and Spencer

Plaintiffs also concede that the involvement of Defendants Sissener and Spencer was "very minor."  (Id.)  Plaintiffs admit that these defendants had no information about Long's behavior and statements made during the intake process, that they were entirely unaware of much of the information relayed to Fischer by

various inmates, and that they "had little understanding of the information that Rodriguez provided to Fischer." (Id.) These conclusions are clearly supported by the record, which shows that Sissener and Spencer's only involvement was accompanying their supervisor, Defendant Cheney, to check up on Long in his cell. Although Sissener and Spencer presumably observed the same things Cheney did during this encounter, they could have justifiably assumed that Cheney was handling the situation appropriately and that no further action on their part was necessary. Moreover, the record shows that Sissener and Spencer did not have as much training and experience as Cheney in identifying and dealing with potentially suicidal inmates. Indeed, Cheney states that the only reason he brought Sissener and Spencer along was for assistance in case physical force became necessary. Under these circumstances a reasonable fact finder could not conclude that Sissener and Spencer were deliberately indifferent to the risk that Long might attempt suicide. Sissener and Spencer are, therefore, entitled to summary judgment.

### c. Defendant Cheney

The Court concludes that the record is sufficient to make out a prima facie claim of deliberate indifference against Defendant Cheney. The undisputed facts show that Cheney was aware that Long was intoxicated when he arrived at the jail and

16

that Long was uncooperative and had threatened officers during the booking process.  While Cheney denies carefully reviewing Long's pre-screening information he admits to checking Long's computer information which included Long's answers to the pre-screening questions.  Most importantly, Cheney was most directly involved with handling the incident in which Long was reported to be acting weird and tying a sheet to his window bars.  Although Cheney states that he believed Long's statements that he was alright and was only using the sheet to exercise, a reasonable fact-finder could conclude otherwise based on Cheney's training and subsequent actions.  For instance, Cheney admits that he repeatedly questioned Long as to whether he was alright, suggesting that Cheney may have doubted Long's statements. Cheney also admits instructing Fischer to closely monitor Long, suggesting that Cheney realized an ongoing danger of some sort. The question of exactly what type or degree of danger Cheney perceived is a fact issue to be decided at trial.  Finally, the evidence shows that Cheney had extensive experience in identifying and handling potentially suicidal inmates.  Based on these circumstances a fact finder could reasonably conclude that Cheney subjectively perceived a serious risk to Long's safety but failed to act appropriately.  Thus, Plaintiffs have met their burden of showing that genuine issues of material fact remain as

to whether Cheney was deliberately indifferent to the risk that Long might attempt suicide.

### d. Defendant Fischer

The record here is also sufficient to make out a prima facie showing of deliberate indifference against Defendant Fischer. As the County Control Officer, Fischer was the officer most directly responsible for monitoring Long's condition and ensuring his safety. Not only was Fischer the first officer to receive reports of Long acting weird and tying a sheet to his window, Fischer also received Cheney's follow-up report and instructions to closely monitor Long. Although Fischer was admittedly less experienced than Cheney, Plaintiffs have presented evidence showing that Fischer had significantly more information than Cheney regarding the risk of Long attempting suicide. For instance, Inmate Bates states that he reported back to Fischer at around 4:00 p.m. that Long was indeed acting weird, that other inmates believed Long would hurt himself, and that Long should be assigned a cell-mate. Although Fischer denies receiving this information, Bates' affidavit is sufficient to create a genuine issue of material fact regarding Fischer's subjective perception of the risk to Long shortly before Long's suicide. Assuming Fischer did receive this information a reasonable fact-finder could conclude that Fischer showed deliberate indifference by not

reporting it to others and instead attempting to monitor Long using only the intercom and inmate assistance. Thus, genuine issues of material fact remain which preclude summary judgment for Fischer.

### C. Qualified Immunity

Having determined that the undisputed facts in this case are sufficient to support a claim of deliberate indifference against Defendants Cheney and Fischer, the Court must now address their assertion of qualified immunity.

### i. Legal Standard

The doctrine of qualified immunity shields government officials from individual liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985). Thus, the Supreme Court has determined that immunity questions should be addressed at the earliest possible stage in litigation. *Hunter v. Bryant*, 502

U.S. 224, 227, 112 S. Ct. 534, 537 (1991).

In *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), the Supreme Court laid out a two-step process for making qualified immunity determinations. Under *Saucier*, courts were first required to answer the following threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201, 121 S. Ct. at 2156. Only if that question was answered in the affirmative would the court address the second question "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Id*. More recently, in *Pearson v. Callahan*, 555 U.S. —--, 129 S. Ct. 808 (2009), the Supreme Court abandoned the "inflexible" two-step inquiry mandated by *Saucier* and permitted courts to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 818.

"Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 598 (2004). If "the officer's mistake as to what the law

requires is reasonable . . . the officer is entitled to the
[qualified] immunity defense." *Saucier*, 533 U.S. at 205-06.
Thus, qualified immunity protects "all but the plainly
incompetent or those who knowingly violate the law." *Malley v.
Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986).

### ii. Clearly Established Law

The Court has already determined that the facts in this
case, taken in the light most favorable to Plaintiffs, are
sufficient to show a violation of a constitutional right by
Defendants Cheney and Fischer.  Thus, the only issue remaining
for qualified immunity purposes is whether the right purportedly
violated here was clearly established when the incident occurred.

A law is clearly established for qualified immunity purposes
if there is a United States Supreme Court or Tenth Circuit
decision directly on point, or if the "clearly established weight
of authority from other circuits" found a constitutional
violation from similar actions.  *Murrell v. School Dist. No. 1*,
186 F.3d 1238, 1251 (10th Cir. 1999).  In evaluating whether an
asserted right is clearly established the Court must properly
define the scope of the right at issue.  The asserted right must
be viewed "in light of the case's specific context, not as a
broad general proposition." *Saucier*, 533 U.S. at 201.  "The
relevant, dispositive inquiry is whether it would be clear to a

reasonable officer that the conduct was unlawful in the situation he confronted." *Id*.

The right at issue in this case is the right of a suicidal pretrial detainee to be afforded reasonable safeguards against harming himself. The right is violated when officials subjectively perceive a serious risk that a detainee may attempt suicide but show deliberate indifference by failing to take reasonable preventative measures. This right was clearly established by the Tenth Circuit in *Barrie v. Grand County, Utah*, 119 F.3d 862, 866 (10th Cir. 1997), which was decided almost ten years before the incident here.

Defendants mistakenly contend that the right asserted in this case was not clearly established because there was no Tenth Circuit or Supreme Court case involving substantially identical facts to those presented here. Although for qualified immunity analysis the right at issue must be viewed in light of the specific context of the case and not as a broad proposition, the facts need not be substantially identical to those in an earlier published opinion. Instead, liability may be imposed if it would have been clear to a reasonable officer, based on then existing law, that a particular course of action was unlawful in the situation confronted. *Saucier*, 533 U.S. at 201.

Here, there can be little doubt that Cheney and Fischer's

chosen course of action--leaving Long alone in an ordinary cell without any visual observation and attempting to monitor him only via intercom and other inmates--would have been clearly unlawful if they subjectively perceived that Long presented a substantial risk of attempting suicide. Moreover, the Court has previously concluded that the evidence presented here, viewed in the light most favorable to Plaintiffs, is sufficient for a reasonable trier of fact to conclude that both Cheney and Fischer subjectively perceived a substantial risk that Long might attempt suicide. Thus, the Court concludes that the right at issue here was clearly established at the time of Long's suicide and Cheney and Fischer are not entitled to qualified immunity.

### D. County Liability

Plaintiffs seek to hold Iron County liable under § 1983 based on the theory that it failed to adequately train its employees to identify and handle potentially suicidal inmates.

Generally, to establish the liability of a municipal entity under Section 1983, a plaintiff must show "(1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." *Jenkins v. Wood*, 81 F.3d 988, 993-94 (10th Cir. 1996). Moreover, the custom or policy must operate as the "moving force" behind the violation. *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 399,

23

117 S. Ct. 1382 (1997). The Supreme Court has held that municipal liability based on a policy of inadequate training requires proof of the municipality's "deliberate indifference" to its inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 1205 (1989). In other words, the failure to train must "reflect [ ] a 'deliberate' or 'conscious' choice by a municipality." *Id*. at 389, 109 S. Ct. at 1205. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998).

Plaintiffs have not presented sufficient evidence to show that Iron County exhibited deliberate indifference by failing to adequately train its employees in suicide prevention. Plaintiff's only evidence concerning Defendants' training is that neither Cheney nor Fischer could recall receiving any inmate suicide training since leaving the academy, and neither could recall during their deposition any specific details of that initial training. This is hardly sufficient evidence to show a direct causal link between Long's suicide and Iron County's standard of training. Plaintiffs do not deny that both Cheney

and Fischer received specific training on identifying and handling suicidal inmates. The fact that neither of them could recall specifics of this training at their depositions is not surprising since the depositions were taken almost two years after the incident. In addition, Plaintiffs claim of inadequate training appears to undermine their contention that Defendants must have perceived Long as a significant suicide risk based on their training and experience.

In sum, Plaintiffs have not met their burden on summary judgment of presenting evidence showing a direct causal link between Long's suicide and any custom or policy of Iron County. Thus, Iron County is entitled to summary judgment.

### IV. Plaintiffs' Motion for Summary Judgment

Plaintiffs have also filed a motion for summary judgment in their favor. As previously discussed, however, Plaintiffs have failed to present evidence showing the violation of any constitutional right by Defendants Gower, Sissener, Spencer and Iron County. Regarding the two remaining defendants, Cheney and Fischer, the Court finds that genuine issues of material fact remain which preclude summary judgment against them at this time. Thus, Plaintiffs' motion for summary judgment is denied.

**ORDER**

Based on the foregoing, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. no. 46) is **GRANTED IN PART** as to defendants **Gower, Sissener, Spencer** and **Iron County**;

(2) Defendants' Motion for Summary Judgment (Doc. no. 46) is **DENIED IN PART** as to defendants **Cheney** and **Fischer**;

(3) Plaintiffs' Motion for Partial Summary Judgment (Doc. no. 45) is **DENIED**; and,

(4) Plaintiffs shall, within sixty days of this Order, amend their Complaint to substitute the Estate of Bradley James Long as the real party in interest in this case.

(5) The parties shall meet and confer to propose a schedule on which this case shall conclude, filing their joint scheduling proposal (noting any disagreements) within thirty days.

DATED this 6th day of February, 2010.

BY THE COURT:

_____
DAVID NUFFER
United States Magistrate Judge